FILED

June 9, 2017

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time 10:41 AM



### TENNESSEE BUREAU OF WORKERS' COMPENSATION
### IN THE COURT OF WORKERS' COMPENSATION CLAIMS
### AT MURFREESBORO

| | | |
|---|---|---|
| PAUL HALBERT | ) | Docket No.: 2016-05-0599 |
|       Employee, | ) | |
| v. | ) | |
| | ) | |
| NESTLE HOLDINGS, INC. | ) | State File No.: 23397-2015 |
|       Employer, | ) | |
| And | ) | |
| | ) | |
| INDEMNITY INS. CO. OF N. AMERICA | ) | Judge Dale Tipps |
| | ) | |
|       Insurance Carrier. | ) | |

---

## EXPEDITED HEARING ORDER DENYING MEDICAL BENEFITS

---

This matter came before the undersigned workers' compensation judge on May 30, 2017, on the Request for Expedited Hearing filed by Paul Halbert. The present focus of this case is whether Mr. Halbert is likely to establish at a hearing on the merits that Nestle must provide additional medical treatment for his hip injury and whether he suffered a low back injury or hernia arising primarily out of and in the course and scope of his employment. For the reasons set forth below, the Court holds Mr. Halbert is not entitled to the requested benefits at this time.

### History of Claim

Mr. Halbert testified that he injured himself on two separate dates while working as a utility driver delivering frozen pizzas for Nestle. The first incident happened on February 16, 2015. While he was pushing a heavy dolly through the snow, his left leg slid straight out, causing him to fall on his right knee. He felt like he pulled something in his hip, but he kept working. On February 19, he slipped on ice and fell on his left hip. He felt pain in his hip but kept working. After a few days, Mr. Halbert reported the injury, and Nestle sent him to Concentra Health Care.

Following conservative care with Concentra for non-radiating left hip pain,

1

Nestle authorized treatment with orthopedic surgeon, Dr. William Shell, who first saw Mr. Halbert on May 18. At that time, Mr. Halbert complained of pain in his hip, "down the leg to the ankle with numbness in his leg." Dr. Shell reviewed MRI films and noted a normal hip. He also noted an error on the radiologist's MRI report, which indicated marrow edema or microfracture. Dr. Shell indicated the report "should say specifically no marrow edema or microfracture." He performed an injection on Mr. Halbert's hip and instructed him to return in two weeks.

On Mr. Halbert's return, he reported that he had "a lot of pain in his lower back and will get some pain in the hip and buttock and it occasionally goes all the way down to the ankle." Dr. Shell ordered a lumbar MRI, believing the back to be a bigger issue than the hip On review of that MRI, Dr. Shell noted, "mild to moderate foraminal narrowing at L5-S1, bilateral with some disc bulges at L5-S1 and annular disc tears at L4-5 and L5-S1." He also wrote: "While this may explain his hip pain, it is difficult to say. At this point, he would I think be served by seeing one of my physical medicine associates for treatment of his back. I do not see any obvious hip pathology." Dr. Shell's WorkLink Report of June 24 confirms that he discharged Mr. Halbert from his care and referred him to physical medicine. He later indicated on a Final Medical Report that June 24 was Mr. Halbert's date of maximum medical improvement (MMI).

In his deposition, Dr. Shell testified that Mr. Halbert initially reported no back pain and never reported any groin pain. He confirmed that he felt Mr. Halbert had a normal lumbar spine exam. When asked about causation, he testified that the degenerative changes on the MRI were not related to Mr. Halbert's work injury. Further, although he thought it would be appropriate for a physical medicine specialist to assess Mr. Halbert's back condition, Dr. Shell "never felt like it was work-related." Regarding the hip injury, he felt Mr. Halbert's hip was "basically normal," even after Mr. Halbert returned to him for evaluation with a new MRI in February 2017. He also noted the radiologist who performed the first MRI in 2015 corrected the report to confirm that there was no microfracture.

Mr. Halbert testified that Nestle provided no medical treatment once Dr. Shell released him. However, he did undergo a number of medical examinations, the first of which was with neurologist Dr. C. M. Salekin on June 13, 2016. In his report, Dr. Salekin diagnosed: 1) bilateral S1 radiculopathies and left L5 radiculopathy "caused by the fall at work on 2/19/15;" 2) left hip microfractures and soft tissue strain "caused by the injury at work on 2/16/15 and made worse by the injury on 2/19/15;" and 3) left inguinal hernia "from repetitive lifting and precipitated by fall at work on 2/16/15." He assigned a thirty-seven percent permanent impairment rating.

During his deposition, Dr. Salekin testified that, more likely than not, all of the conditions he diagnosed arose out of Mr. Halbert's work accidents in February 2015. On cross-examination, he indicated his belief that Mr. Halbert's groin pain from the hernia

began on February 19, but he was unable to explain how he reached that conclusion. He testified there was no one cause for the hernia, but that repetitive lifting weakened the abdominal wall and the hernia "was precipitated" by the fall. Dr. Salekin also testified that Mr. Halbert told him that immediately after his fall on February 16, he had back pain that intermittently radiated to his buttocks, calves, and feet. He said Mr. Halbert had consistent radiculopathy from the date of the injury until he examined him. Regarding his conclusions about Mr. Halbert's hip, Dr. Salekin stated that he relied on the radiologist's report that concluded Mr. Halbert had a microfracture.

At Nestle's request, Mr. Halbert saw neurosurgeon Dr. Robert Weiss for an evaluation on September 14, 2016. Dr. Weiss stated in his report that Mr. Halbert complained of "wide ranging symptoms, primarily back pain and left hip pain, with some localized bilateral distal leg pain that he describes as calf tightness." He noted that the MRI showed a right lateralizing disk protrusion/herniation, opposite to the side where he complained of pain. Dr. Weiss concluded that, with the exception of some centralized low back pain, Mr. Halbert's symptoms were not likely due to his disc protrusion. He testified in his deposition that Mr. Halbert's symptoms were inconsistent with radiculopathy. "In fact, they described nothing that would be neurally and anatomically based." Regarding the cause of the herniation, Dr. Weiss stated: "One could presume that the disk protrusion may well have been caused by his slip and fall on the ice, less likely due to the pulling incident he reports, 3 days previously." However, he did not know what caused the disc protrusion and said he was "not really convinced that [Mr. Halbert] had a back injury." He did not feel Mr. Halbert needed any surgery for his lumbar condition and stated Mr. Halbert needed no further medical treatment for his back.

In November 2016, Mr. Halbert saw Dr. Richard Fishbein for an evaluation. Dr. Fishbein was not deposed and his report consists of the following paragraph:

> I have evaluated Mr. Paul Halbert on November 29, 2016. He was involved in a slip and fall at work on February 16, 2015 and again on February 19, 2015. Mr. Halbert suffered injuries to his left hip and lumbar spine as well as developing a left inguinal hernia. He has had basically no treatment and is not at MMI. Based on my review of his medical records and my interview with Mr. Halbert I believe his injuries primarily arose out of his work-related falls. He needs to be evaluated by a general surgeon for his hernia. His lumbar spine and left hip would likely benefit from conservative treatment including physical therapy and epidural steroid injections.

Nestle also arranged a medical evaluation with Dr. Toney Hudson, an internist and occupational medicine specialist. He examined Mr. Halbert in December 2016 and stated in his report that he agreed with Dr. Shell's conclusion that surgical intervention for the

3

lumbar condition was unwarranted. Dr. Hudson felt Mr. Halbert's symptoms were "consistent with a mechanical muscular injury." He also observed symptoms of peripheral vascular disease in Mr. Halbert's legs. He felt this was the most likely cause of Mr. Halbert's most significant symptom, pain in his left leg. Dr. Hudson stated, "The symptoms in his left leg are not related to his lumbar spine and are certainly not related to his accident of February 2015." Regarding the hernia, Dr. Hudson also noted that Mr. Halbert said he had no symptoms or was aware of his hernia until his attorney told him about it.

During his deposition, Dr. Hudson confirmed that he reviewed Mr. Halbert's MRI report, and it did not explain any type of radicular symptoms. His examination of Mr. Halbert's lumbar spine was unremarkable. In Dr. Hudson's opinion, the most significant finding was only a faint femoral pulse in the right leg, and no palpable femoral pulse behind the left knee or in the left foot, which was indicative of peripheral vascular disease related to Mr. Halbert's smoking. He felt Mr. Hablert's leg symptoms were "very consistent" with vascular claudication, or pain related to blockage in a major blood vessel.

Mr. Halbert testified in the hearing that his hip and leg pain began immediately after the first fall and was much worse after the second accident. He has had groin pain ever since the falls but thought it was related to his hip injury. Based on his prior physical examinations, he does not believe he had a hernia before these work accidents.

On cross-examination, Mr. Halbert admitted that he filled out intake forms at Concentra and only listed his hip in response to questions about what parts of his body were hurting. Further, he admitted he never reported any problems with his back, legs, or groin to Concentra. Similarly, he failed to indicate on the intake form at Dr. Shell's office that he had any problems other than hip pain. He also admitted testifying in his discovery deposition that Dr. Salekin was the first doctor to whom he reported groin pain and that the first time he had back pain was after Dr. Shell's hip injection.

Mr. Halbert also answered a number of questions about a Medical Examination Report dated September 16, 2015, for an examination required to maintain his commercial driver license (CDL). On the form, Mr. Halbert denied any injury in the last five years, as well as any chronic low back pain. He admitted that he lied to the examiner in order to keep his CDL because he hoped he would be able to find work as a driver after he recovered from his injuries.

Mr. Halbert seeks medical treatment for his low back condition and his inguinal hernia, as well as continued treatment for his left hip. Nestle denies that Mr. Halbert is entitled to any additional medical treatment. It contends his hip condition has resolved according to Dr. Shell. It also contends Mr. Halbert is not likely to prove his alleged back and hernia injuries arose primarily out of and in the course and scope of his work.

4

**Findings of Fact and Conclusions of Law**

The following legal principles govern this case. To prove a compensable injury, Mr. Halbert must show that his alleged injury arose primarily out of and in the course and scope of his employment. To do so, he must show his injury was primarily caused by an incident, or specific set of incidents, identifiable by time and place of occurrence. Further, he must show, "to a reasonable degree of medical certainty that it contributed more than fifty percent (50%) in causing the . . . disablement or need for medical treatment, considering all causes." "Shown to a reasonable degree of medical certainty" means that, in the opinion of the treating physician, it is more likely than not considering all causes as opposed to speculation or possibility. *See* Tenn. Code Ann. § 50-6-102(14) (2016).

However, because this case is in a posture of an Expedited Hearing, Mr. Halbert need not prove every element of his claim by a preponderance of the evidence in order to obtain relief. Instead, he must come forward with sufficient evidence from which this Court might determine he is likely to prevail at a hearing on the merits. *See* Tenn. Code Ann. § 50-6-239(d)(1); *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Mar. 27, 2015). Applying these principles to the facts of this case, the Court cannot find that Mr. Halbert has met his burden at this time.

The parties submitted several medical opinions regarding the cause of Mr. Halbert's symptoms including that of the ATP, Dr. Shell. The parties offered no evidence regarding whether Mr. Halbert selected Dr. Shell from a panel of doctors offered by Nestle. Therefore, his opinion cannot be afforded the presumption of correctness established by Tennessee Code Annotated section 50-6-102(14)(E) (2016). Thus, in resolving the different opinions presented, the Court notes longstanding Tennessee case law that provides:

> When the medical testimony differs, the trial judge must obviously choose which view to believe. In doing so, he is allowed, among other things, to consider the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts.

*Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991); s*ee also Darraj v. McKee Foods Corp.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 4, at *13-14 (Jan. 17, 2017).

As a preliminary matter, the Court finds that the lack of any information regarding Dr. Fishbein's qualifications, his examination, or the information available to him precludes any serious consideration of his opinion. Therefore, although his letter was properly admitted into evidence under the rules for an Expedited Hearing, the Court

5

ascribes little weight to his opinion.

Applying the first two of the *Orman* factors to the remaining physicians, the Court notes that Dr. Shell and Dr. Weiss are practicing, board-certified orthopedic surgeons and neurosurgeons, respectively. Dr. Hudson is a board-certified internal medicine specialist, practicing principally in occupational medicine. Dr. Salekin is a board-certified neurologist at the VA Medical Center, where he is the Director of Sleep Medicine.

While not entirely determinative, Dr. Salekin's qualifications and the circumstances of his evaluation are somewhat less favorable, in that his regular practice seems to have little to do with his evaluation of Mr. Halbert. Further, although Dr. Salekin testified he has a "part-time practice in independent medical evaluation," his description of that practice, if not exactly troubling, was at least ill-defined. He had difficulty explaining his record-keeping system for his IME practice. He explained that he only saw his IME patients after-hours and sometimes performed his evaluation at the office of the patient's attorney. He was unable to identify who prepared his final report in this case, testifying that he hand-wrote the report and gave it to Mr. Halbert's attorney's office to type. The Court finds the qualifications of Drs. Shell, Weiss, and Hudson to be more relevant to evaluating the types of injuries alleged by Mr. Halbert and the circumstances of their evaluations to be more favorable.

The information available to the evaluating physicians also weighs against Dr. Salekin's conclusions regarding Mr. Halbert's hip and back claims. He concluded in his report and his deposition that Mr. Halbert suffered from a microfracture of the left hip. He testified that he based this conclusion on the radiologist's report, apparently unaware that the radiologist later amended his report to state that there was no microfracture.

Similarly, Dr. Salekin testified that he based his opinion on the cause of Mr. Halbert's back problems at least in part on Mr. Halbert's statement that his radiating back pain began immediately after his accident. However, the medical records from Concentra and Dr. Shell belie this history, as does Mr. Halbert's deposition testimony that the first time he had back pain was after Dr. Shell's hip injection, approximately three months after his fall. Another problem with Dr. Salekin's conclusion is the fact that both Dr. Shell and Dr. Weiss recorded negative straight leg raise testing in their evaluation of Mr. Halbert, which, according to Dr. Shell, indicates there is no nerve impingement.

Dr. Salekin's opinion regarding the hernia is similarly problematic. He testified that Mr. Halbert developed pain in the groin within a few hours after the February 19 accident. Again, this is inconsistent with the intake documents and other records from Concentra and Dr. Shell, as well as Mr. Halbert's admission that Dr. Salekin was the first doctor to whom he reported groin pain.

The last *Orman* factor is also significant in this case. The other physicians'

6

analysis of Dr. Salekin's permanent impairment rating suggests an error in his methodology. For instance, his rating of twenty-five percent impairment for the lumbar condition is predicated on a category of disability that requires a finding of multiple levels of disc herniation with multiple-level radiculopathy. Dr. Weiss and Dr. Hudson both noted that Mr. Halbert had no clinically documented findings of multi-level radiculopathy and, at most, a single-level disc protrusion.[1] While the extent of Mr. Halbert's permanent impairment is not an issue at this stage of the claim, Dr. Salekin's overreach calls his credibility into question.

After careful consideration of the factors set out in *Orman*, the Court finds Dr. Salekin's causation opinions to be less persuasive than those of the other medical providers. Mr. Halbert therefore appears unlikely to prevail at a hearing on the merits that his back condition and inguinal hernia arose primarily out of his work accidents.

Even setting aside the *Orman* analysis, it appears unlikely that Mr. Halbert would prevail on his hernia claim. This is because the Workers' Compensation Law sets out additional requirements for establishing a compensable hernia injury, which Mr. Halbert failed to prove. In Tennessee, benefits may be awarded for a work-related "hernia or rupture" if:

(1) There was an injury resulting in hernia or rupture;
(2) The hernia or rupture appeared suddenly;
(3) It was accompanied by pain;
(4) The hernia or rupture immediately followed the accident; and
(5) The hernia or rupture did not exist prior to the accident for which compensation is claimed.

*See* Tenn. Code Ann. § 50-6-212(a) (2016).

Based on the evidence presented to date, the Court finds Mr. Halbert would have difficulty establishing that his accident caused a hernia or rupture, as Dr. Salekin, the only physician to ascribe the hernia to Mr. Halbert's fall, testified there was no one cause for the hernia, but that repetitive lifting weakened the abdominal wall and the hernia "was precipitated" by the fall. Further, there is no evidence that the hernia appeared suddenly or immediately followed the accident, as Mr. Halbert admitted that he was unaware of it until his attorney advised him of the MRI results, many months later.

Mr. Halbert contended the Court should not rely too heavily on the lack of reported back and hernia symptoms. He testified his pain was somewhat global and he initially assumed it all stemmed from his hip, even though it was also coming from his

---

[1] The radiology report does not mention herniations at all. Rather, the radiologist concluded "L4-L5 minimal and L5-S1 mild disc bulges with desiccated disc disease and annular disc tears at these levels."

back and the hernia.  The Court recognizes that multiple injuries may sometimes mask the source of pain.  However, the identification of back pain in this case did not occur until at least three months after the accident.  For a lumbar condition as debilitating as that alleged by Mr. Halbert, the Court finds the evidence too tenuous to ascribe that condition to so remote an event.

Regarding Mr. Halbert's hip condition, there is no dispute that he suffered an injury and was entitled to authorized medical treatment.  The question is whether he is entitled to any additional treatment at this time.  Dr. Shell, the ATP, testified that Mr. Halbert did not need any additional treatment for his hip injury.  While that does not terminate Mr. Halbert's right to medical treatment, he has not presented any evidence suggesting Dr. Shell is incorrect or that his condition has changed since Dr. Shell reached that conclusion.  Absent sufficient medical evidence that he needs further treatment for his hip, the Court cannot find that Mr. Halbert appears likely to prevail in a claim for additional medical benefits at a hearing on the merits.

**IT IS, THEREFORE, ORDERED** as follows:

1.  Mr. Halbert's claim against Nestle and its workers' compensation carrier for the requested medical benefits is denied.

2.  This matter is set for an Scheduling Hearing on August 2, 2017, at 8:30 a.m.  You must call 615-741-2112 or toll free at 855-874-0473 to participate.  Failure to call in may result in a determination of the issues without your further participation.  All conferences are set using Central Time (CT).

**ENTERED this the 9th day of June, 2017.**

_____
**Judge Dale Tipps**
**Court of Workers' Compensation Claims**

8

**APPENDIX**

Exhibits:
1. Accident reports
2. Letter from Dr. Richard Fishbein
3. Indexed medical records
4. Transcript of Dr. Toney Hudson's deposition
5. Transcript of Dr. William Shell's deposition
6. Transcript of P.A. Nan Vincelli's deposition
7. Transcript of Dr. Robert Weiss' deposition
8. Transcript of Dr. C. M. Salekin's deposition

Technical record:[2]
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Expedited Hearing

---

[2] The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Expedited Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expedited Hearing Order Denying Medical Benefits was sent to the following recipients by the following methods of service on this the 9th day of June, 2017.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|----------------|---------|-----------|------------------|
| D. Russell Thomas | | | X | russthomas@thethomaslawfirm.com |
| Lane Moore | | | X | lane@moorerader.com |


_____
**Penny Shrum, Clerk of Court**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**